25 CV 07463

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WarnerMedia Network Sales, Inc., Discovery Communications, LLC, Scripps Networks, LLC, The Travel Channel, L.L.C., Television Food Network, G.P., and Cooking Channel, LLC, | Index No. |
| | **COMPLAINT** |
| Plaintiffs, | |
| vs. | |
| DISH Network L.L.C., | |
| Defendant. | |

Plaintiff WarnerMedia Network Sales, Inc. (f/k/a Turner Network Sales, Inc.) ("**WMNS**"), and Plaintiffs Discovery Communications, LLC, Scripps Networks, LLC, The Travel Channel, L.L.C., Television Food Network, G.P., and Cooking Channel, LLC (collectively, "**DCI/Scripps Programmers**" and, together with WMNS, "**Programmers**" or "**Plaintiffs**"), allege, by and through their undersigned counsel, as follows:

## PRELIMINARY STATEMENT

1.      This is a breach of contract action against DISH Network, L.L.C. ("**DISH**") to enjoin DISH's unauthorized distribution, transmittal, and sale of Programmers' valuable television networks and other content as part of DISH's new Day, Week, and Weekend Passes (the "**Passes**") on its Sling TV platform. The Passes violate the limited license that Programmers granted to DISH to distribute their networks and content and disrupt the longstanding industry-standard model for linear programming subscriptions.

2.    Programmers granted DISH limited licenses to distribute certain of their linear television networks, including TNT, CNN, TBS, HGTV, Investigation Discovery, Food Network, and other channels and content (collectively, the "**Programming**"), pursuant to two, independent affiliation agreements: (1) the Turner-DISH Affiliation Agreement (as defined below) and (2) the DCI/Scripps-DISH Affiliation Agreement (as defined below) (collectively, the "**DISH Affiliation Agreements**").[1] DISH aggregates the Programming with other television networks and content and delivers it over the Internet to its Sling TV subscribers who sign up for one of its monthly subscription services, including Sling Orange.

3.    Importantly, the DISH Affiliation Agreements require that the Programming be distributed as part of a subscription service. This is because Programmers depend on monthly subscriptions to finance, acquire, develop, produce and program hundreds of different programs for their 24/7 network programming.

4.    DISH is now breaching the DISH Affiliation Agreements by exceeding the scope of rights granted to it under those agreements through its recently announced and launched "industry-first" Passes, which offer temporary access to the Programming without a subscription. In fact, DISH expressly stated in its press release and in some advertisements that the Passes would allow consumers to watch certain content "without a subscription."[2]

---

[1] The Turner-DISH Affiliation Agreement is attached hereto as Exhibits 1A and 1B. The DCI/Scripps-DISH Affiliation Agreement is attached hereto as Exhibit 2A and 2B.

[2] *See, e.g.*, *Day Pass by Sling Gives Sports & TV Fans Unparalleled Flexibility Starting at $4.99*, Sling (August 12, 2025)

5.     DISH also has expressly touted Programmers' networks in its advertisements to induce consumers to sign up for the Passes. Indeed, in advertising the Passes, DISH has specifically highlighted the "top entertainment channels like TNT [and] TBS," "breaking news on CNN," "food programming on . . . Food Network," and "true crime on Investigation Discovery."[3] Moreover, in promoting the Passes as providing viewers with access to their "favorite channels," DISH references Programmers' brands and channels alongside other popular channels, as shown below:



6.     The Passes violate both the plain language of the DISH Affiliation Agreements and the longstanding industry practice of offering television content through monthly subscription services. It should come as no surprise, therefore, that DISH announced and launched the Passes without consulting or even notifying Programmers.

---

https://www.sling.com/whatson/announcements/sling-day-week-weekend-passes.

[3] *Day Pass by Sling*, supra note 2.

7.      DISH's brazen actions are causing and will continue to cause irreparable harm to Programmers. The Passes undermine Programmers' business model, which depends on monthly subscriptions. Indeed, Programmers specifically bargained for, and DISH agreed to, a subscription-based approach to distribution of their content. Programmers create, license, and develop their linear programming content with the knowledge that subscribers will have access to these channels twenty-four hours a day, seven days a week, on a recurring basis for at least a month at a time. And subscriptions to MVPD services are priced accordingly, allowing consumers to generally pay a lower cost per event than they would if each event were offered a la carte. The Passes fundamentally disrupt this industry-standard model by allowing customers to purchase access to the most sought-after Programming, such as major sports events, essentially a la carte for a fraction of the cost that the consumer would have had to pay to watch the event on a pay-per-view basis. For example, a sports fan could simply purchase a Day Pass and watch select Programming, such as a highly popular sports game, without purchasing a month-long subscription or paying a higher pay-per-view fee. This inherently devalues the Programming as a whole and harms Programmers' goodwill with consumers.

8.      The Passes also threaten to disrupt Programmers' relationships with their other distribution partners, who may now wish to distribute the Programming on a non-subscription basis too. Indeed, many of Programmers' other distribution partners already have contacted Programmers about seeking the ability to offer similar short-term "passes."

9.      Programmers promptly sent DISH written notice of its violation of the DISH Affiliation Agreements, demanding that DISH cease and desist from offering Programmers' content through the Passes. DISH has refused to cease and desist from its unauthorized use and distribution of the Programming. Accordingly, Programmers had no choice but to bring this action to enjoin DISH's unauthorized and irreparably harmful conduct.

**PARTIES**

10.     Plaintiff WMNS is a Georgia corporation with its principal place of business in Atlanta, Georgia.

11.     Plaintiff Discovery Communications, LLC is a Delaware limited liability company with its principal place of business in New York, New York. Its sole member is Discovery Communications Holding, LLC, which is a Delaware limited liability company with two members: (a) DHC Discovery, Inc., which is a Delaware corporation with its principal place of business in New York, New York; and (b) Warner Bros. Discovery, Inc., which is a Delaware corporation with its principal place of business in New York, New York.

12.     Plaintiff Scripps Networks, LLC is a Delaware limited liability company with its principal place of business in Knoxville, Tennessee. Its sole member is Networks Holdings, LLC, which is a Delaware limited liability company with its principal place of business in Knoxville, Tennessee. The sole member of Networks Holdings, LLC is Scripps Networks Interactive, Inc., an Ohio corporation with its principal place of business being Knoxville, Tennessee.

13.     Plaintiff Television Food Network, G.P. is a Delaware general partnership with its principal place of business in Knoxville, Tennessee. Television Food Network, G.P. has four partners: (a) Cable Program Management Company, G.P., a Delaware general partnership with its principal place of business in Knoxville, Tennessee; (b) CPMCO Holdings, LLC, a Delaware limited liability company with its principal place of business in Knoxville Tennessee; (c) Food Network Holdings, LLC, a Delaware limited liability company with one member (Scripps Networks, LLC), and with its principal place of business in Knoxville, Tennessee; and (d) Tribune (FN) Cable Ventures, Inc., a Delaware corporation with its principal place of business in Chicago, Illinois. The sole member of CPMCO Holdings, LLC is Cable Program Management Company, G.P., which has three partners: (i) Food Network Holdings, LLC, a single-member Ohio limited liability company (with Scripps Networks, LLC being the sole member) with its principal place of business in Knoxville, Tennessee, and; (ii) Scripps Networks Interactive, Inc.; and (iii) WBD Investment Holdings LLC, a Delaware limited liability company with its principal place of business in Knoxville, Tennessee. The sole member of WBD Investment Holdings LLC is Scripps Networks Interactive, Inc.

14.     Plaintiff The Travel Channel, L.L.C. is a Delaware limited liability company, with its principal place of business in Knoxville, Tennessee. Its sole member is Scripps Networks Interactive, Inc.

15.     Plaintiff Cooking Channel, LLC is a Delaware limited liability company, with its principal place of business in Knoxville, Tennessee. Its sole member is Plaintiff Television Food Network, G.P.

16.     Defendant DISH is a Colorado limited liability company, with its principal place of business in Englewood, Colorado. Upon information and belief, DISH's sole member is DISH DBS Corporation, which is a Colorado corporation with its principal place of business in Colorado. DISH entered into the DISH Affiliation Agreements with Programmers, which grant DISH a limited, non-exclusive license for the transmission, distribution, and sale of Programmers' networks and content through subscription services.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over DISH pursuant to 28 U.S.C. § 1332 because complete diversity exists between the parties and DISH's conduct has caused and will cause irreparable harm to Programmers and an injury that exceeds $75,000. Defendant is incorporated in Colorado, and all Programmers are incorporated in states other than Colorado and have a principal place of business in states other than Colorado. Further,

18.     This Court also has personal jurisdiction over DISH because DISH regularly transacts business and/or contracts for goods or services in New York. Further, ███████████████████████████████████████ ███████████████████. *See* Ex. 1A § 18; Ex. 2A § 17(d)(ii).

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3), including because ███████████████████████████████████████

████████████████████████████████████████████

██ . Ex. 1A § 18; Ex. 2A § 17(d)(ii).

## FACTUAL ALLEGATIONS

I.    **Programmers Granted DISH Limited Licenses to Distribute Their Valuable Content as Part of Subscription Services**

20.    Programmers develop and produce valuable networks and license the rights to distribute those networks pursuant to affiliation agreements with multi-channel video programming distributors ("**MVPDs**"). MVPDs like DISH then distribute that content to consumers who subscribe to their offerings.

21.    The content offered on the networks is extremely valuable, and includes live sports, news, and entertainment content that is available to subscribers 24 hours a day, seven days a week. TNT, TBS, and TruTV all telecast highly popular professional and college sports, including MLB, NASCAR, NHL, Big 12 Football, Big East Basketball, U.S. Soccer, and the NCAA March Madness tournament. CNN—a household name from which much of the American public gets its news—broadcasts highly-watched news programs, such as *The Lead with Jake Tapper* and *Anderson Cooper 360.* And the Food Network, HGTV, and Investigation Discovery similarly offer acclaimed and widely-known series, including *Property Brothers*, *Diners, Drive-Ins, and Dives*, *Chopped*, and *American Monster.*

22.    Programmers invest heavily in this content, which relies on a monthly subscription model.  For example, Programmers pay significant funds to acquire telecast rights for popular sporting events like MLB regular season and playoff games (including the National League Championship Series), Big 12 college football

games, Big East basketball matchups, NHL regular season and playoff games, and NCAA March Madness games. Programmers also invest substantial funds to create, produce, and air popular sports, news, and entertainment programs such as *Inside the NHL*, *Anderson Cooper 360*, and *Property Brothers*.

23.     Programmers premise their investment decisions on the expectation that they will be able to monetize their diverse content through the industry-standard subscription model. The subscription model requires that customers of MVPDs will subscribe to that service for at least a month at a time. This means that a consumer is more likely to watch a broader variety of programming, rather than simply tuning into a single sports match or other solitary event. As a result, Programmers can safely assume that consumers will spend some portion of their subscription viewing other content, such as breaking news, movies, and hit television shows. These requirements allow Programmers to diversify their investments in a wider range of content that appeals to more consumers.

24.     On the other hand, allowing consumers to pick and choose individual programs or days of the week to subscribe to would make it impossible for Programmers to properly plan and invest in their linear programming or monetize all the content they acquire and produce for their linear networks. Decisions to invest in single event programming, such as pay-per-view, are based on a different set of requirements and are priced differently than programs that air on a linear network. Indeed, the subscription model is better suited to offering continuous and ongoing programming on a linear network, such as weekly MLB or NHL regular

season games, because consumers pay a recurring fee for continuous access to multiple telecasts over the subscription period. Knowing that consumers will have to subscribe to watch recurring sporting events is an important consideration to Programmers when deciding to purchase a package of sports media rights.

25.     For these reasons, Programmers require distributors like DISH to distribute, transmit and sell their Programming as part of a subscription service. This requirement, to which DISH expressly agreed, is set forth in each of the two DISH Affiliation Agreements.

26.     WMNS ███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████. Ex.

1A § 2.A. ████████████████████████████████████

██████████████ *See id.* at 4, 8 (emphasis added). ████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████" *Id.* at 5 (emphasis added). The Turner-

DISH Affiliation Agreement also ██████████████████████

████████████████████████████████████████████████

██████████████" Ex. 1A § 2.A, at 3 (emphasis added).

27.    Similarly, the DCI/Scripps Programmers ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, the "**DCI/Scripps-DISH**

**Affiliation Agreement**"). Like the Turner-DISH Affiliation Agreement, the

DCI/Scripps-DISH Affiliation Agreement requires DISH to distribute the networks

as part of a subscription offering. Specifically, ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" *See* Ex. 2A § 3(a)(iii), at 24.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮" *Id.* § 1, at 21 (emphasis added).

28.    Further, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮. *See* Ex. 1A § 24(A)(i) ("▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████ .”); Ex. 2A § 3(g) (“████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████ .”).

29.     The subscription business model is the standard across the industry, with other broadcasters licensing their content to MVPDs using the same monthly subscription model. Moreover, Programmers' own direct-to-consumer streaming services, Discovery+ and HBO Max, also operate based on a recurring, monthly or annual subscription model. And when Programmers do offer content a la carte, they typically do so on a pay-per-view basis.

30.     This longstanding industry practice also is reflected in DISH's own Terms of Use for the Sling TV service, which recognize that "certain of our Services may be made available by us solely in connection with your agreement to purchase a subscription to such Services for a set period (e.g., *monthly or yearly subscription term*) (collectively, 'Subscription Services')."[4] Further, the Terms of Use clarify that "[r]egardless of the period for which you purchased any Subscription Services,

---

[4] *Sling TV Terms of Use*, Sling, at § 4.B (effective June 16, 2025) https://www.sling.com/offer-details/disclaimers/terms-of-use?footer=true (emphasis added).

following the completion of any such subscription period, your Subscription Services will automatically renew on a month-to-month basis at the then-current standard rates for monthly access to the same Subscription Services, unless and until they are cancelled or changed by you or Sling TV in accordance with these Terms of Use."[5] Accordingly, based on the Terms of Use of DISH's own Sling service, subscriptions by definition mean a month-to-month recurring commitment, and do not include products offered over periods of shorter duration.

## II.    DISH Launches The Unauthorized Day Pass, Weekend Pass, And Week Pass

31.    DISH just recently publicly announced and launched the Passes in mid-August. The Passes offer consumers the ability to access the networks and content available through Sling Orange, including the Programming, for one-day, a weekend, or a week.

32.    The Passes are not "subscription" services. The plain meaning of the word "subscription" requires that there be a relationship of a continuing or periodic nature. Typical subscription plans satisfy this definition because they offer access to television content on a monthly basis, with the subscription renewing each month unless and until the consumer cancels their subscription.

33.    The Passes, on the other hand, are single-purchase transactional services that provide consumers access to the Programming for finite periods of time and do not automatically renew.

---

[5] *Sling TV Terms of Use*, supra note 5.

34.    DISH has conceded, including in its own public statements and advertisements, that the Passes are not subscription services and are intended to break from the established industry practice.

35.    Upon information and belief, DISH's website, on or around the launch of the Passes, prominently advertised Day Pass providing "24 hours of access to ESPN, TNT & more *with no subscription*":



36.    Upon information and belief, DISH altered this advertisement to remove the phrase "with no subscription" after another programmer raised similar issues with DISH concerning the Passes.

37.    DISH also announced in a press release that it was "breaking the mold" and "flipping the script on traditional streaming bundles" by launching the Day Pass for $4.99, Weekend Pass for $9.99, and the Week Pass for $14.99 on Sling TV.[6] The press release stated that the Passes "challenge industry norms" and offer

---

[6] *Sling TV Launches Industry-First $4.99 Day Pass Redefining How Viewers Watch Live TV*, DISH Newsroom (August 12, 2025), https://about.dish.com/2025-08-12-Sling-TV-Launches-Industry-First-4-99-Day-Pass-Redefining-How-Viewers-Watch-Live-TV.

"viewers instant, 24-hour access to live TV, sports and entertainment" on channels like TNT, CNN, and TBS "without a long-term commitment" and with "no strings attached."[7] The press release also quoted Seth Van Sickel, Senior Vice President of Product and Operations at Sling TV, who stated that the Passes allow users to tune in for popular sporting events, award shows, and spontaneous movie nights "all without having to sign a long-term, binding contract."

38.    Another page on the Sling website made similar statements. Customers were told that they "don't need to remember to cancel: When your access is up, you won't be charged again until you purchase another Day Pass." DISH advertised that users will be able to access "popular sports channels . . . top entertainment channels like TNT [and] TBS, . . . breaking news on CNN . . . food programming on . . . Food Network . . . [and] true crime on Investigation Discovery[.]" Further, users were told that they could access content through the Passes without "recurring charge[s]" and "**without a subscription**." The release also emphasized that the Week and Weekend passes are "perfect for those . . . following Saturday's college football action – and everything in between!"[8]

39.    The "Frequently Asked Questions" section on the Sling Website for "Flexible passes" again reiterated that signing up requires "no commitment" and

---

[7] *Sling TV Launches Industry-First $4.99 Day Pass Redefining How Viewers Watch Live TV*, DISH Newsroom, supra note 6.

[8] *Day Pass by Sling Gives Sports & TV Fans Unparalleled Flexibility Starting at $4.99*, Sling (August 12, 2025) https://www.sling.com/whatson/announcements/sling-day-week-weekend-passes (emphasis added).

informs users that they can choose to upgrade from just the Passes to a "monthly subscription."[9] On information and belief, the Sling Website also informed customers that after the Day Pass ended, they would "not be charged again until the next time you order another Sling Day Pass *or subscribe to the service*."

40.    Customers are also able to purchase "Extra Packs" to add to their Day, Week, and Weekend Passes. These "Extra Packs are available for $1 each with the Sling Day Pass, $2 with the Weekend Pass, and $3 with the Week Pass." The announcement of the Passes specifically informs customers that Science Channel is provided in the News Extra option and Turner Classic Movies is included in the Hollywood Extra option.[10] When purchasing a Day, Weekend, or Week Pass, customers are given the option of adding Programmers' Programming as a part of various 1-day, weekend, or 7-day bundles, including Turner Classic Movies, Boomerang, TruTV, HLN, Cooking Channel, American Heroes Channel, Magnolia, Science Channel, Destination America, and Cartoon Network/Adult Swim. For example, a customer can add on the Entertainment Extra for $1 and gain access to 14 channels, including TruTV and Cartoon Network/Adult Swim:

---

[9] *Flexible Subscription Options for the Way You Watch*, Sling, https://www.sling.com/service/compare-plans (last accessed on August 30, 2025).

[10] *Day Pass by Sling Gives Sports & TV Fans Unparalleled Flexibility Starting at $4.99*, Sling (August 12, 2025) https://www.sling.com/whatson/announcements/sling-day-week-weekend-passes.



41.    Further, in advertising the Passes, DISH has relied heavily on Programmers' branding and content, emphasizing that CNN, TNT, TBS, HGTV, Investigation Discovery, and Food Network are available via the Passes:



42.    Accordingly, the Passes are single-purchase transactional services that require "no subscription," as admitted by DISH itself. Further, in contradiction of

DISH's own definition of what constitutes a subscription as set forth in Sling's Terms of Use, the Passes (1) allow access to the Programming for as little as one-day at a time, instead of on a monthly or annual basis, and (2) do not automatically renew absent cancellation.

43.    In clear violation of the DISH Affiliation Agreements, DISH is providing these short-term, non-subscription Passes to consumers, allowing them temporary access to Programmers' highly valuable programming and content, including TNT, TBS, TruTV, CNN, HGTV, Investigation Discovery, and Food Network through the base Passes and other networks and content through the add-ons. There is nothing in the DISH Affiliation Agreements that grant DISH the ability to distribute, transmit, or sell the Programming in this manner.

44.    In an interview with Deadline, Seth Van Sickel, SVP of Product and Operations at Sling TV, stated that "programming partners were briefed about the company's plans for the short-term subscription."[11] This representation is false at least as to Plaintiffs here, as DISH never informed, consulted, or briefed Programmers before announcing or offering the Passes. Instead, Programmers were blindsided by the announcement, learning of the launch of the Passes by reading DISH's press announcement and third-party news websites.

_____

[11] Dade Hayes, *Sling TV Slices Up the Bundle, Launching Subscriptions For Day, Weekend and Full Week Starting at $4.99*, Deadline (Aug. 12, 2025), https://deadline.com/2025/08/sling-tv-slices-up-the-bundle-subscriptions-dish-streaming-1236483566/

45.    Upon learning of the Passes, Programmers promptly contacted DISH and demanded that it cease and desist from offering the Programming through the Passes, explaining that the Passes violated the DISH Affiliation Agreements. DISH, however, has refused to cease offering the Programming through the Passes.

46.    Furthermore, on information and belief, DISH continues to revise its marketing content for the Passes to remove any implication that the Day Passes are not a subscription after receiving cease and desist communications regarding the unauthorized use of the content. But DISH's after-the-fact cover-up does not change the facts or alter the nature of the Passes.

47.    For example, on August 12, 2025, the price comparison chart on Sling.com described the traditional monthly plan as a "monthly subscription" with the Passes merely being described as a "[o]ne time charge" to provide "access."



Upon information and belief, after receiving content holders' complaints, the current monthly subscription page now provides no mention of subscriptions.[12]

_____

[12] *Flexible Subscription Options for the Way You Watch*, Sling,



48.    Additionally, on information and belief, in attempting to downplay the channels of other licensors, DISH has pivoted its advertising to focus more heavily on Plaintiffs' content to the further detriment of Plaintiffs:

Original:



Altered:



https://www.sling.com/service/compare-plans (last accessed on August 30, 2025).

### III.    The Passes Are Causing And Will Cause Plaintiffs Irreparable Harm

49.    DISH's unauthorized actions are causing and, if not enjoined, will continue to cause irreparable harm to Programmers. The damage done to Programmers by these actions cannot be adequately remedied by money damages and the harms, including the perception of the value of Programming in the public eye, will worsen each day DISH continues to violate the terms of the DISH Affiliation Agreements.

50.    As discussed above, Programmers' core business model for the Programming is based upon monthly subscriptions. Programmers develop, finance, and produce the Programming based on the expectation that consumers will have access to all of that content for at least a month (not as part of short-term, one-time transactions), during which time the consumers are more likely to consume a variety of content (rather than one-off events). DISH's unauthorized, non-subscription model allows customers to pick and choose their access to Programming for as little as 24 hours for only $4.99. This fundamentally undermines Programmers' business model and negatively impacts the perceived value of the Programming. Allowing users to simply purchase snippets of the Programming on a one-time transaction basis thus circumvents Programmers' carefully curated networks by essentially allowing consumers to watch pay-per-view content for a fraction of the price that it would cost if the same program were offered a la carte.

51.    The Passes also fundamentally harm Programmers' standing in the marketplace, including their relationships with other distributors and downstream consumers.

52.    Upon hearing of DISH's actions, other MVPDs have contacted Programmers about the Passes and indicating that they may seek the right to distribute the Programming as part of similar short-term, non-subscription offerings if DISH continues to do so. DISH's unexpected launching of this unauthorized service has and will cause confusion amongst these partners believing that Programmers contracted for the short-term Passes, when in fact they did not. These partners may also seek to compel Programmers to allow them to distribute the Programming as part of similar short-term passes.

53.    In addition, consumers will perceive less value in the Programming due to DISH's actions, which convert the content that Programmers have invested billions of dollars to create and maintain, and that can only be obtained with a subscription, into ephemeral commodities.

54.    The harm that Programmers face is particularly pressing given that DISH decided to launch this new offering at a key time of the year, when many sports leagues are about to begin their seasons and baseball playoffs are around the corner. It is no coincidence that DISH launched the Passes when they did. DISH calculated the launch of the service prior to the start of various sports seasons and playoff games, when consumers are more likely to subscribe to an MVPD. DISH strategically planned the launch without notifying Programmers to capitalize on

popular sports seasons and offer the Passes as long as they could get away with the clearly violative conduct. By providing these short offerings at this time, DISH is causing further harm to Programmers, including by inducing consumers to sign up for the Passes instead of a subscription offering. If left unchecked, DISH's ongoing breach will also deprive Programmers of the substantial revenues that they would otherwise receive through subscription offerings as a result of consumers signing up to watch premium events that are offered through the Programming, such as Big 12 College Football games, MLB playoff games, including the NLCS, and the start of the NHL season.

55.    Additionally, even if customers sign up for one of the Passes to initially watch content not owned by Programmers—such as the U.S. Open and college football games on other networks—Programmers are still harmed to the extent those consumers have access to Programmers' content through the Passes. Moreover, Programmers are further harmed to the extent customers would have otherwise subscribed to a subscription service that includes both the desired event and the Programming but instead choose the Passes as a quick-hit option.

## FIRST CAUSE OF ACTION
### Breach of Contract

56.    Programmers repeat and reallege Paragraphs 1 through 55 of this Complaint as if fully set forth herein.

57.    Programmers and DISH are parties to the DISH Affiliation Agreements, which are valid, binding and enforceable contracts.

58.    Programmers fully performed their obligations under the DISH Affiliation Agreements, including by granting DISH the means to distribute, transmit and sell the Programming on the Sling TV platform as part of subscription offerings, such as Sling Orange.

59.    DISH materially breached the DISH Affiliation Agreements' terms by distributing the Programming through the Passes, which are not subscription services.

60.    As a result of DISH's breach, Programmers have suffered and will continue to suffer substantial, immediate, and irreparable injury, for which there exists no adequate remedy at law.

61.    Unless enjoined by this court, DISH will continue to breach its agreements with Programmers, and Programmers are entitled to injunctive relief to halt and enjoin DISH's conduct. Plaintiffs have also suffered substantial harm from DISH's breach prior to issuance of any injunction.

62.    Accordingly, Programmers respectfully request that the Court declare that the Passes are not subscription services within the meaning of the DISH Affiliation Agreements and that that DISH's distribution of the Programming through the Passes violates those Agreements.

## SECOND CAUSE OF ACTION
### (Injunctive Relief)

63.    Programmers repeat and reallege Paragraphs 1 through 62 of this Complaint as if fully set forth herein.

64.    Programmers are likely to succeed on their breach of contract claim for the reasons discussed above.

65.    DISH has and will continue to inflict significant, imminent, and competitive irreparable harm to Programmers, including by creating marketplace confusion, undermining Programmers' business models and relationships with other MVPDs, impairing Programmers' goodwill and business reputation, and causing Programmers to lose customers. Determining the monetary damages for these harms would be near impossible given the intangible nature of many of these injuries, including loss of goodwill.

66.    The balance of hardships also weighs in favor of Programmers. On the one hand, Programmers will suffer continual and irreparable injuries unless and until DISH is enjoined from offering the Programming through the Passes. On the other hand, DISH will face little to no genuine hardship in discontinuing the Passes. Enjoining DISH from offering Programming through the Passes would merely be a return to the status quo that DISH bargained for in the DISH Affiliation Agreements. Additionally, the Passes were only launched in mid-August, and the Passes by DISH's own description involve no contracts or commitments. Accordingly, DISH can simply discontinue the Passes without disrupting any standing customer contracts or disrupting a long-standing user base. Until DISH is enjoined from offering the Passes, it will be allowed to free ride off Programmers' highly valuable content at Programmers' expense.

67.    For the same reasons, the public interest will not be harmed by an injunction as the public will still have numerous options to access the Programming through both DISH and other MVPDs, and discontinuing the newly introduced Passes would merely be a return to the status quo.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court:

A.    Enter judgment in Plaintiffs' favor on each cause of action;

B.    Declare that the Passes are not subscription services with the meaning of the DISH Affiliation Agreements and that DISH's distribution of the Programming through the Passes violates those Agreements;

C.    Preliminarily and permanently enjoin DISH from offering, marketing, advertising, selling, or distributing Programming through the Passes and/or any manner other than a monthly or annual subscription as required in the DISH Affiliation Agreements, or enabling a third party to do the same; and

D.    Grant such other relief as this Court deems just and proper.

Dated:     September 5, 2025
           New York, New York

Respectfully submitted,

By: _____
    David L. Yohai
    Theodore E. Tsekerides
    A.J. Green
    Blake J. Steinberg
    Jon Ward
    WEIL, GOTSHAL & MANGES LLP
    767 Fifth Avenue
    New York, New York 10153
    T: (212) 310-8000
    F: (212) 310-8007
    david.yohai@weil.com
    theodore.tsekerides@weil.com
    a.j.green@weil.com
    blake.steinberg@weil.com
    jon.ward@weil.com

    *Counsel for Plaintiffs*