UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WarnerMedia Network Sales, Inc. et al., <br><br>            Plaintiffs, <br><br> -against- <br><br> DISH Network L.L.C., <br><br>            Defendant. | 25-cv-7463 (AS) <br><br> <u>OPINION AND ORDER</u> |

ARUN SUBRAMANIAN, United States District Judge:

 This is the second of two related cases seeking a preliminary injunction to bar DISH Network from selling "Sling Passes," which allow customers to stream TV networks for a day, weekend, or week through DISH's "Sling Orange" service. *See ESPN Enters., Inc. et al. v. DISH Network L.L.C.*, 2025 WL 3215571 (S.D.N.Y. Nov. 18, 2025) (denying plaintiffs' motion). In this case, Warner Bros. and Discovery (WBD) networks are at issue, and the licensing agreements are different from the one in *ESPN*. But the outcome is the same. For the reasons below, WBD's motion is DENIED.

## LEGAL STANDARD

 "A preliminary injunction 'is one of the most drastic tools in the arsenal of judicial remedies.'" *Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 298 (S.D.N.Y. 2021) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). "It 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Id.* (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). "A party seeking a preliminary injunction must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *Id.* (quoting *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018)).

## DISCUSSION

### I. WBD has failed to demonstrate a likelihood of success on the merits.

 Under New York law, a breach-of-contract plaintiff "must plead and prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach." *Vista Food Exch., Inc. v. Comercial De Alimentos Sanchez S De R L De C.V.*, 147 F.4th 73, 88 (2d Cir. 2025) (quoting *Nat'l Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004)). No one disputes the existence of the two relevant contracts—the "Turner-DISH Affiliation Agreement" and the "DCI/Scripps Affiliation Agreement"—which apply to different subsets of

WBD's networks. WBD says DISH breached those Agreements because they don't cover Passes or Pass users. Dkt. 26 at 2. But the Agreements are ambiguous on this score, and the extrinsic evidence furnished by the parties at this stage doesn't resolve that ambiguity in WBD's favor. So WBD hasn't shown that its argument is likely to succeed.

As an initial matter, the Agreements don't expressly define the terms "subscriber" or "subscription." The Turner Agreement, in the "Grant of Rights" section, grants DISH the right to distribute WBD's networks to "Service Subscribers" through defined "DISH OTT Services." "DISH OTT Service" means any "OTT Service," which in turn "means a video programming subscription service offering through which multiple linear video programming services are distributed in the Territory via the Internet through a website and/or application on a live 24/7 simulcast Streaming basis and sold to end users for a subscription fee." Dkt. 27-1 § 1, at 4–5, 8–9; § 2 at 14.

The parties dispute whether the reference to "subscription service" moves Sling Orange out of the definition when users access it through Passes. DISH says the Passes are subscriptions. WBD says they aren't. The problem here is that "subscription" isn't defined in the contract.

Although "subscription" isn't defined, one might think that the definition of "Service Subscriber" would clarify whether Pass users are covered. Unfortunately, it doesn't. A "Service Subscriber" is "a Customer that is intentionally authorized by DISH to receive the applicable Service." Dkt. 27-1 § 1, at 12. And a "Customer" is a "residential subscriber authorized by DISH to receive video programming services via a DISH OTT Service." *Id*. at 3. Despite the Turner Agreement's 13 pages of definitions, "subscriber" also isn't defined.

So, instead of clarifying whether Passes or Pass users are covered, the Turner Agreement's defined terms just beg the question of what "subscriber" and "subscription" mean.

The same is true for the DCI/Scripps Agreement. That Agreement grants DISH the right to distribute WBD's networks via "the Sling Orange Service" to "Sling Traditional Service Subscribers to such Traditional Service." Dkt. 27-3 § 3(a)(iii)(A), at 24. "Sling Orange Service" means "the single stream, multi-channel, paid subscription, predominantly English-language video programming service made available via the Sling Platform currently known as 'Sling Orange.'" Dkt. 27-3 § 1, at 21. Again, the dispute is about the term "subscription," but "subscription" isn't defined.

The definition of "Sling Traditional Service Subscribers" doesn't help either. They are "Sling Subscriber[s] validly authorized by DISH to receive the Traditional Service via the Sling Platform."[1] Dkt. 27-3 § 1, at 22. And a "Sling Subscriber" is "a person validly authorized by DISH to receive a programming service via the Sling Platform." Dkt. 27-3 § 1, at 21–22. Here, DISH says that the "Sling Traditional Service Subscribers" and "Sling Subscribers" definitions are broad,

---

[1] The parties don't dispute that a "Traditional Service" includes all the linear programming networks covered by the DCI/Scripps Agreement. Dkt. 27-3 §1, at 23.

given that there's no minimum subscription length or other terms specified. So according to DISH, "any person that DISH authorizes to receive a programming service via the Sling platform under [the DCI/Scripps Agreement] is a subscriber, has a subscription." 11/5/25 Hearing Tr. at 185. But at oral argument, WBD explained, pointing to the phrase "validly authorized," that the purpose of the "Service Subscriber" term is solely to distinguish authorized users of the Sling platform from pirates. And when the Court asked if "anyone disagrees that's to ferret out pirates and other people who don't have authorization," DISH's counsel didn't disagree, and she admitted that the definition "does somehow put us back into what is a subscription." *Id.* at 186–87.

Here, the Court notes a relevant difference between the licenses at issue here and the one in *ESPN*. In *ESPN*, the "Subscriber" definition was broader, as it encompassed any "person intentionally authorized by DISH to receive *any level of video programming service or package of programming networks* via the Sling Platform." 2025 WL 3215571, at *2 (emphasis added). That language, which obviously helped DISH's case the last time around, is missing from the relevant parts of these Agreements. Indeed, the "any level of video programming service" language *is* employed elsewhere in the Turner Agreement, in a portion that isn't at issue here. Dkt. 27-1 § 1, at 3 (defining "Customer" with respect to a direct broadcast satellite system). This weighs in WBD's favor. But it's still inconclusive as to whether Passes are either included or excluded from the Agreements' scope. Just as in *ESPN*, what's missing is any language defining "subscriber" or "subscription" to require a recurring, monthly purchase arrangement. That's notable because these are sophisticated parties and each Agreement is detailed, with over ten pages of defined terms. *See Utica Mut. Ins. Co. v. Clearwater Ins. Co.*, 906 F.3d 12, 18 (2d Cir. 2018) ("[W]hen the negotiated contract is between sophisticated parties . . . , 'courts should be extremely reluctant to interpret an agreement as impliedly stating something.'" (quoting *Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 30 N.Y.3d 508, 518–19 (2017))). To win a preliminary injunction against a new offering like the Passes, more is needed.

Without a contractual definition of "subscription" or "subscriber" in either of the Agreements, the Court next looks to conventional understandings of what these terms mean. *See ABCNY, Inc. v. Axis Surplus Ins. Co.*, 738 F. Supp. 3d 418, 423 (S.D.N.Y. 2024) (determining that courts may "resort to sources such as dictionaries to determine the plain and ordinary meaning" when a word in a contract is undefined). Here, as in *ESPN*, the parties dispute whether a "subscription" requires a recurring payment or agreement for multiple periods of time (which would exclude Passes), or merely requires that a customer receive access for a particular time, as opposed to a particular program offering (which would include them). *See* 2025 WL 3215571, at *3. In *ESPN*, the Court reviewed the relevant dictionary definitions, which are the same ones relied on here, and held that, taken together, they don't clearly include or exclude the Passes. *Id.*[2]

---

[2] Although WBD emphasizes the Agreements' "reservation of rights" language, the relevant issue here is antecedent: namely, whether the Passes are "subscriptions" and Pass users are "subscribers." If they are, then the Agreements cover them. If they aren't, then the Agreements don't. Either way, the reservation of rights doesn't kick in.

The License Fee provisions of the Agreements don't clarify the issue either. WBD says the Turner Agreement's provisions regarding fees show that the parties didn't intend to include Passes, because there's "no explicit mechanism for payment based on short-term, nonsubscription offerings like the Passes." Dkt. 26 at 21. But the Turner Agreement provides for payment based on average-daily-subscriber numbers. Dkt. 27-1 §7(B)(i)(b), at 41–42. And as WBD's President of Networks and Streaming Distribution acknowledges, this license-fee methodology provides compensation for partial-month subscribers. Dkt. 27 ¶ 17. In other words, *every single* Pass user is counted in the average-daily-subscriber calculation. Dkt. 45 ¶ 18. So the Turner Agreement's License Fee provision doesn't indicate, one way or the other, whether the parties intended to include or exclude Passes.

WBD also claims there's no explicit mechanism in the DCI/Scripps Agreement for DISH to pay for Passes, so that must mean the parties intended to exclude them. Dkt. 26 at 20. Under this Agreement, license fees are calculated the same way as in *ESPN*. *See* 2025 WL 3215571, at *4. Payment is based on "(A) taking the sum of the number of such Service Subscribers . . . as of the last day of the applicable Reporting Period and the number of such Service Subscribers . . . as of the last day of the immediately preceding Reporting Period and (B) dividing that sum by two." Dkt. 27-3 § 8(b)(i), at 53. The "Reporting Period" spans from the "22nd day of one calendar month [to] the 21st day of the following calendar month." Dkt. 27-3 § 1, at 18. WBD, like the plaintiffs in *ESPN*, points out that most Pass users won't be subscribed on the relevant measurement dates, so they'll fall through the cracks. It says that can't have been the intent of the parties.

True enough, just as in *ESPN*, this payment framework suggests the parties contemplated that subscribers would at least generally be monthly in nature. *See ESPN*, 2025 WL 3215571, at *3. But nothing in the License Fee provision says that partial-month subscribers are foreclosed. Plus, as DISH points out, the DCI/Scripps Agreement contains a minimum-subscription-length provision applicable to WBD's discovery+ streaming service, which suggests the parties knew how to—and did—include such a restriction in other contexts. Dkt. 43 at 5–6; Dkt. 27-3 §6(c)(iv), at 42 (requiring that DISH offer discovery+ "only on an a la carte basis as part of a monthly subscription"); *see Wade Park Land Holdings, LLC v. Kalikow*, 589 F. Supp. 3d 335, 393 (S.D.N.Y. 2022) ("The drafter's decision to include a modifier in one provision and not in another is presumed to be knowing and intentional.").

Here, as in *ESPN*, the Court recognizes that the parties' chosen payment mechanism in the DCI/Scripps Agreement, coupled with the new offering of Passes, will result in users left uncounted. *See* 2025 WL 3215571, at *4. Whether that's unfair or not is disputed, because DISH must pay WBD a full-month license fee for active Pass users on the 21st day of a month, even though they're only signed up for a fraction of a month. *See id.* (noting the same issue); Dkt. 49 ¶ 11(c) (DISH's expert calculating that WBD would be paid *more* for Passes under this method than under a daily average method). But for present purposes, WBD hasn't established the kind of absurdity or economic infeasibility that could support resolving the ambiguity in the definition of "subscription" in its favor. *See Wells Fargo Bank, N.A. v. United States Life Ins. Co. in City of New York*, 2025 WL 2220948, at *8 (S.D.N.Y. Aug. 4, 2025) ("Under New York law, only

4

contracts that very nearly produce the opposite effect of what the parties likely desired will be held to be absurd." (internal quotations omitted)). To be clear, at trial the evidence concerning the parties' negotiations—including concerning the License Fee provisions—might counsel a verdict for WBD. But at this juncture, the record doesn't support the extraordinary preliminary relief that WBD is seeking.[3]

Finally, extrinsic evidence doesn't resolve the ambiguity and, if anything, favors DISH. *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 816 (2d Cir. 2014) ("[The Court may] consider extrinsic evidence to illuminate an ambiguous contractual term."). Mostly, the parties highlight the same kinds of extrinsic evidence as in *ESPN*, which the Court found indeterminate there. *See* 2025 WL 3215571, at *5. At oral argument in this case, however, DISH pointed out that the parties' 2015 license governing the networks in the Turner Agreement contained allocations for users who might cancel access after a week-long free trial. For those users, WBD "was okay with getting paid for seven days." Hearing Tr. at 18. DISH then elicited testimony that the 2015 negotiating team also negotiated the Agreements, so the parties had "talked about a very similar scenario where someone could be on the system for just seven days," but WBD still didn't put any "stopgap" into the Agreements to bar Passes. Hearing Tr. at 193.

For its part, WBD says this doesn't show any "course of dealing" as to *Passes*. It emphasizes that the free trials were under a different agreement, DISH wasn't getting paid for them, and they automatically rolled into paid monthly subscriptions. *Id.* at 19–20. Those differences caution against definitively resolving the ambiguity in favor of DISH. But to justify a preliminary injunction, WBD needs to win on offense, not just defense. At this early stage, the extrinsic evidence doesn't show WBD is likely to succeed on the merits.

***

For the reasons stated above, the Agreements are ambiguous as to whether they cover Passes or Pass users. To be clear, this doesn't mean that the Passes are covered. Especially when it comes to Daily Passes, a jury hearing all the evidence may conclude that they are outside the reach of what a "subscription" fairly includes under the Agreements. But at this preliminary stage, WBD has failed to show a likelihood of success on the merits.[4]

## II. WBD has failed to show irreparable harm.

Even if WBD could show a likelihood of success on the merits, it fails to show irreparable harm warranting preliminary injunctive relief. "The irreparable harm requirement is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *State Farm Mut. Auto.*

---

[3] As in *ESPN*, if DISH has structured its Passes to purposefully evade the Agreements' payment requirements, then that could constitute a breach of contract or breach of the implied covenant of good faith and fair dealing. 2025 WL 3215571, at *5. WBD may raise such issues as this case proceeds.

[4] WBD also hasn't shown "serious questions" going to the merits together with a balance of hardships tipping decidedly in its favor, see *infra* section III.

*Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 80 (2d Cir. 2024) (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)). "To establish irreparable harm, the moving party must show an 'injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.'" *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*, 131 F.4th 102, 106 (2d Cir. 2025) (quoting *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020)). WBD hasn't made that showing.

WBD claims it will suffer harm to its 1) relationships with other distributors, 2) revenue streams, 3) value and brand, and 4) right to exclude unauthorized distribution of its networks. Dkt. 26 at 25–34. These categories are nearly identical to those advanced in *ESPN*, but the evidence differs somewhat. Still, like the plaintiffs in *ESPN*, WBD fails to show that those alleged harms aren't speculative and that they can't be measured and remedied through money damages.

*First*, WBD says other distributors have complained about the Passes and will demand similar rights. Dkt. 26 at 32; Dkt. 27 ¶¶ 27–28. Any such harm is speculative for the same reasons the Court discussed in *ESPN*. 2025 WL 3215571, at *6. And WBD points to no case within this Circuit showing that "mak[ing] it increasingly more difficult for [WBD] to maintain similar requirements with other distributors as time goes on" is enough to show irreparable harm. Dkt. 26 at 32.[5]

*Second*, WBD claims the Passes threaten to disrupt and harm its revenue streams. Dkt. 26 at 31–34. Like the plaintiffs in *ESPN*, it says the Passes will undermine its advertising business because they make it harder to predict subscriptions, which will in turn make WBD's networks less attractive to advertisers. Dkt. 26 at 32–33; Dkt. 24 ¶¶ 12–14. Relatedly, WBD claims that "[i]f left unchecked, DISH's actions will deprive Programmers of the substantial revenues that they would otherwise receive through subscription offerings." Dkt. 26 at 30.

Both arguments fail. As to advertising, a WBD Senior Vice President's statement that she "believe[s] the Passes will negatively alter the viewership trends through all of [WBD's] linear networks" and that "[t]his decrease in total viewership will make it difficult for Programmers to meet our advertising goals for our advertisers" doesn't show that advertising sales have declined or will imminently decline because of the Passes. Dkt. 24 ¶ 16. And DISH points to testimony that the Passes may *benefit* advertising sales by increasing viewership. Dkt. 48 ¶ 7. As in *ESPN*, the

---

[5] The Court is unpersuaded by WBD's out-of-circuit authority in which testimony that "unlicensed services . . . had been specifically referenced as a concern during negotiation meetings with licensees" supported a finding of irreparable harm. *Disney Enters., Inc. v. VidAngel, Inc.*, 224 F. Supp. 3d 957, 976 (C.D. Cal. 2016); *accord Fox Television Stations, Inc. v. FilmOn X LLC*, 966 F. Supp. 2d 30, 49–50 (D.D.C. 2013). Those cases involved completely unlicensed services and blatant copyright infringement, which aren't at issue here. In any event, a claim of "irreparable harm" based on similar concerns is speculative because WBD hasn't shown that Passes "*have resulted* and *will result* in" lost "relationships with customers and co-brand partners." *Register.com, Inc. v. Verio, Inc.*, 126 F. Supp. 2d 238, 248 (S.D.N.Y. 2000) (emphasis added), *aff'd as modified*, 356 F.3d 393 (2d Cir. 2004).

6

Court finds the evidence on this issue inconclusive at this stage. 2025 WL 3215571, at *6.[6] Next, WBD's evidence doesn't support its claim that the Passes siphon customers who would otherwise become monthly subscribers. *See* Dkt. 63 ¶ 32 (WBD's expert stating only that he would "*expect* . . . for there to be economically significant cannibalization of subscriptions" (emphasis added)). As in *ESPN*, if DISH invalidly sold Passes that diminish WBD's ad revenue, prevent it from acquiring content, or siphon customers who would otherwise become monthly subscribers, that could be measured and remedied with money damages. 2025 WL 3215571, at *6 (citing *M.V. Music v. V.P. Recs. Retail Outlet, Inc.*, 653 F. Supp. 3d 31, 40–41 (E.D.N.Y. 2023) ("Courts in this Circuit have consistently held that allegations that a defendant's [actions] created an economic disadvantage and an economic loss of sales for a plaintiff are exactly the type of monetary harm [that] can be rectified by financial compensation." (internal quotations omitted))).

*Third*, WBD asserts that "the Passes diminish the perceived value of Plaintiffs' programming as a whole by allowing consumers to access content whenever they want without a subscription, and for a significantly lower price than if the same content was offered on a pay-per-view basis." Dkt. 26 at 29. But WBD hasn't offered any evidence from consumers that the Passes make them consider WBD's networks less valuable. *See id.* (relying only on a WBD executive's statement that "consumers will see less value in Pay TV subscriptions" because of Passes). That's not enough to show irreparable harm, for the same reasons discussed in *ESPN*. *See* 2025 WL 3215571, at *7.

*Fourth*, as to WBD's right to exclude unauthorized distribution, the Court explained in *ESPN* why these cases were materially different. *See* 2025 WL 3215571, at *8.[7] To the extent that WBD has fetched cases not addressed there, they involve facts not yet established here, such as credible threats to the plaintiffs' continued existence, present and significant financial harm, and diminishing the perceived quality of the plaintiffs' programming.[8]

---

[6] WBD's cases to the contrary are inapposite. *See Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1368 (Fed. Cir. 2001) (affirming grant of preliminary injunction based on patent-specific presumption and because the district court by contrast *credited* testimony that "price erosion and loss of market position was likely and would constitute irreparable harm"); *Hutzler Mfg. Co. v. Bradshaw Int'l, Inc.*, 2012 WL 3031150, at *17 (S.D.N.Y. July 25, 2012) (finding that the plaintiff "*will* suffer irreparable harm—in the form of decreased market share, loss of its position as market leader, and price erosion—if an injunction is not issued" (emphasis added)); *Nat'l Kitchen Prods., Inc. v. Kelmort Trading & Co.*, 1992 WL 18805, at *2 (S.D.N.Y. Jan. 24, 1992) (finding irreparable harm after concluding that the plaintiff was "threatened with serious harm to its ability to compete," and that its "reputation for reliability" and "relationships with . . . distributors" were "imminently threatened").

[7] WBD retains termination rights in both Agreements that are materially identical to those at issue in *ESPN*. Dkt. 27-1 § 12, at 45; Dkt. 27-3 § 13, at 64.

[8] *See China Cent. Television v. Create New Tech. (HK) Ltd.*, 2015 WL 3649187, at *13 (C.D. Cal. June 11, 2015) (finding irreparable harm in part because the defendants' service "materially reduced the number of individuals who subscribe to authorized [programming]," permitted "stream[ing] [the plaintiff's] programming in the U.S. without a license . . . several hours before that programming is available in the U.S. through authorized channels," and did so through "poor quality transmissions" that viewers would associate with the plaintiff's programming); *Advanced Access Content Sys. Licensing Adm'r, LLC v. Shen*,

7

Finally, as in *ESPN*, WBD could likely quantify its alleged harm using various forms of readily obtainable information. *See* 2025 WL 3215571, at *8 (identifying examples). Indeed, WBD's expert admitted that "a survey could be done" to evaluate how many customers used Passes instead of monthly subscriptions, but he "just didn't have enough time to do it." Hearing Tr. at 58. For these reasons, WBD hasn't shown irreparable harm.

### III. WBD has not shown that a preliminary injunction is in the public interest or that the balance of equities favors an injunction.

For the same reasons the Court explained in *ESPN*, WBD hasn't met its burden on this factor. *See* 2025 WL 3215571, at *8.

### CONCLUSION

For the reasons stated above, WBD's motion for a preliminary injunction is DENIED. However, as the Court has noted above, the agreements in this case are not identical to the one the Court analyzed in *ESPN*. Specifically, they lack the "any level of programming service" language in the *ESPN* license's "Subscriber" definition. Given this distinction, and the commercial stakes at issue in the continued availability of DISH's Passes, the Court will entertain an expedited schedule for discovery, summary judgment, and trial in this case. By January 2, 2026, the parties shall meet, confer, and submit a proposed case management schedule that will get this case to trial in an expedited fashion. The Court will resolve any dispute between the parties and will promptly get this case moving towards summary judgment and trial.

The Clerk of Court is directed to terminate Dkt. 26.

SO ORDERED.

Dated: December 23, 2025
New York, New York

ARUN SUBRAMANIAN
United States District Judge

---

2015 WL 13840969, at *16 (S.D.N.Y. Mar. 16, 2015) (finding irreparable harm where the "[p]laintiff's entire business depends upon its ability to prevent the copying of copyrighted works," and the defendant distributed a software that precluded the plaintiff from doing so); *Warner Bros. Ent. Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1013–14 (C.D. Cal. 2011) (finding irreparable harm in part because the defendants' activities "offer[] a sub-optimal customer experience," "jeopardize the continued existence of [the p]laintiffs' licensees' businesses" and "the loss of revenue to [the plaintiffs], which is already significant, will continue to increase"); *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 679 (7th Cir. 2012) (affirming injunction after determining that the district court did not clearly err in finding that the plaintiff's "franchises would be terminated" in the absence of an injunction and thereby showed irreparable harm).